J. A. Scovel et al., Appellants, v. J. P. Monaghan, Appellee.

**BILLS AND NOTES:** Fraud—Evidence—Sufficiency. Evidence attending the giving of a promissory note for stock foods reviewed, and held to justify a finding of fraud on the part of the payee.

**TRIAL:** Instructions—Construction as a Whole. A clear and accurate statement of the law, once given, need not be repeated.

**EVIDENCE:** Declarations as to Possession. On an issue whether one is in possession of property as owner, or as agent only, his declarations relative to the nature of such possession are admissible.

**APPEAL AND ERROR:** Inconsequential Testimony. The erroneous admission of immaterial but inconsequential testimony is harmless.

**BILLS AND NOTES:** Tainted Note—Burden of Proof. Proof that a note was, in its inception, tainted with fraud, throws the burden of proof upon the holder to show that he is a holder "in due course."

*Appeal from Madison District Court.*—W. H. Fahey, Judge.

October 27, 1917.

Rehearing Denied May 10, 1918.

Suit upon an instrument, including a promise to pay. The defendant admitted his signature, but averred that it was obtained by the fraud of the payee and its agent, McCarty. The general nature of the fraud thus charged is that McCarty induced the defendant to believe that he was signing a receipt. It is further averred that the paper to which the defendant's signature was attached was a printed form in blank; that the blanks therein were afterwards filled in without authority, so as to make it appear as the present

note, and that there was, thereby, a fraudulent alteration of the paper signed by the defendant.

The plaintiffs deny the affirmative allegations of the answer, and plead the negligence of the defendant as an estoppel. Plaintiffs also aver that they were purchasers of the note in due course, without notice. There was a trial to a jury, and a verdict for the defendant. The plaintiffs appeal—*Affirmed*.

*M. J. Carey* and *W. S. Cooper,* for appellants.

*A. W.* and *Phil R. Wilkinson,* and *J. P. Steele,* for appellee.

EVANS, J.—I. The instrument sued on was as follows:

"P. O. Winterset, Ia., R. F. D. No.——

1. BILLS AND NOTES: fraud: evidence: sufficiency.

July 10, 1914.

"Western Stock Remedy Co., Newton, Iowa.

"Please ship to M. James Monahan at Winterset, F. O. B. Newton, Iowa:

"Quantity                                          Price

15,000 lbs. Hog Powder                    6

        lbs. Horse Powder

        lbs. Sheep Powder

        lbs. Cattle Powder

    30 Self Feeders Free

        1 gal. can Stock Dip

        5 gal. cans Stock Dip

        Spray Pumps

"On the first day of Nov., 1914, for value received, I agree to pay $900.00 to the order of Western Stock Remedy Co., at Newton, Iowa.

"R. A. McCarty,                          J. P. Monaghan,

    "Salesman.                                Purchaser."

McCarty was a capable and intelligent traveling agent for the payee of the instrument. He was canvassing Madi-

son County for the sale of stock food for his principal. The defendant was an intelligent farmer of Madison County, who resided in town, and who owned an automobile. McCarty procured his services to transport him from place to place, and to aid him thereby in the selling of stock food. A number of customers were visited in one day, and one or two sales were made. McCarty left on the 5 o'clock train, and carried with him the signature of the defendant to the paper which is in evidence. The circumstances of the signing, as detailed by Monaghan, were that they were much hurried to get to the depot at Patterson in time to enable McCarty to catch the 5 o'clock train. The train was pulling into the depot at the time they came up to it. McCarty had solicited Monaghan to purchase some of the stock food for the purpose of resale by Monaghan, but Monaghan had declined to do so. Thereupon, McCarty asked Monaghan to make deliveries for him, which Monaghan agreed to do. After arriving at the depot, while the train which McCarty was to take was standing there, and ready to start, McCarty took a book out of his pocket, and said to Monaghan, in substance, that he wanted him to sign a receipt for the deliveries, which he could show to his principal. Thereupon, Monaghan signed the same, believing it to be such receipt. The signature thus affixed is the signature to the present instrument sued on. About one week later, the goods were shipped to the address of Monaghan. Being notified of their arrival, he paid no attention to the notice. A week thereafter, Danford appeared. He was an agent, and perhaps manager, of the stock food company. While Danford was there, and under his directions, as Monaghan claims, he found a place for the storing of the goods, and employed a drayman to haul the same. He and Danford also drove out into the country for the purpose of making sales and deliveries. They took 300 pounds of this particular shipment with them. They made one sale at Macksberg. Later, McCarty came upon the scene,

and spent several days in canvassing the territory, Monaghan transporting him, as before. It is the claim of Monaghan that he repudiated the instrument as soon as he discovered that they claimed to have one. This first occurred in his conversation with Danford on the first trip.

The testimony of Monaghan is contradicted by that of McCarty. McCarty admitted in his testimony that the instrument was signed by Monaghan while the train was standing at the depot. He claimed, however, that the train stopped there ten minutes, and that Monaghan had abundant time to read the instrument. He also testified that Monaghan agreed to make the purchase, and that the price was the wholesale price, which was from one to two cents per pound lower than the retail price.

One of the grounds, urged with much vigor, for a reversal, is that the verdict is wholly unsupported by the evidence. Our first impressions on the submission were inclined to be adverse to the defendant. A careful reading of the entire record has changed our views in that respect. There are some infirmities in Monaghan's testimony, and doubtless some exaggerations. On the other hand, the testimony of McCarty is very unsatisfactory, and, to our minds, quite inconsistent. His testimony shows practically no negotiations with Monaghan for the purchase of such a large order. He admits, in effect, that, up to the moment of driving into the depot, while the train was standing there, there was not yet any oral understanding between him and Monaghan that Monaghan would make a purchase of any amount. It does not appear from the testimony of either McCarty or Monaghan that the *amount* of the order was ever mentioned. If McCarty understood that a bona-fide sale was made, no explanation is apparent why Danford and McCarty should spend their time later in that territory in the same manner as before. Danford's explanation is that he was simply following a custom of the house to as-

sist the wholesale men. Yet he admitted that, for the day which he traveled in Madison County with Monaghan, and for the sale which they made at Macksberg, he paid Monaghan $10. McCarty denied in his testimony that he ever had agreed to pay Monaghan $10 a day or any other sum, and denied that he had ever paid him. At this point, the testimony of Monaghan and that of McCarty are in direct conflict. McCarty's contention was that he split the commission with Monaghan. His explanation of his work subsequently to the signing of the instrument is that he was aiding Monaghan, and Monaghan was splitting commission with him. If Monaghan's compensation before the alleged purchase was a split commission on the sale, and was likewise a split commission thereafter, it is difficult to see a motive for an intelligent man to execute his note in advance for $900 for the mere prospect of selling 15,000 pounds. It will serve no useful purpose for us to go into a detailed discussion of the evidence. It is sufficient to say that the state of the evidence is such as to sustain a finding by the jury that there was fraud or artifice on the part of McCarty in obtaining Monaghan's signature. The artifice which the evidence tended to show was that he had so timed the act that defendant could not take the time to read the instrument without endangering McCarty's opportunity to catch the train. True, Monaghan could have taken the time, and had a right to be indifferent as to whether McCarty caught the train or not; but the contrary mental attitude was quite natural, and it was for the jury to say whether, under all the circumstances, he acted as a reasonably prudent man.

II. The appellant has specified a large number of errors relied on for reversal, and has presented the same in argument with much force. There are 21 of these, and it

is not practicable for us to discuss them singly. They group themselves quite naturally about certain basic propositions, and we shall so consider them. Appellant points out some omissions in certain instructions. For instance, it is said that a certain instruction advised the jury that they must "find from the evidence," whereas it should have said, a "preponderance of evidence." The trial court gave an instruction upon the subject of preponderance that covered the ground fully, and we have frequently held that it is not necessary for the court to carry the word "preponderance" throughout the instructions, in making reference to the evidence. It is pointed out that one instruction ignored the duty of the defendant to "exercise ordinary diligence." And yet, in another instruction, the trial court laid down the rule of diligence as strongly as the appellant could wish. There was no inconsistency in the instructions where such reference was omitted. The foregoing is illustrative of the nature of the objections made to the instructions. We find, by a careful examination of the instructions, that each objection is fully met by other consistent instructions.

2. TRIAL: instructions: construction as a whole.

III. Some evidence of conversations was introduced on behalf of the defendant that was objected to on the ground that they were self-serving declarations. This evidence consisted of statements made by Monaghan, more particularly to drayman Hoots, who hauled the goods. These statements were to the general effect that the goods did not belong to Monaghan, but that Danford was the owner thereof. The first of these statements was made when Monaghan was notified of the arrival of the goods. The second was made in the presence of Danford himself. An issue arose on the trial as to whether Monaghan had waived his defense by accepting the goods. The actual taking of the goods from the depot

3. EVIDENCE: declarations as to possession.

occurred in the presence of Danford. Monaghan claimed that what he did, he so did at the request of Danford. Hoots testified that Monaghan introduced Danford to him, saying that he was the owner of the goods. Monaghan's contention was that he sustained the attitude only of an agent, and not that of owner. The possession of the goods was consistent with a claim of agency. We think the declarations complained of were competent, as bearing upon the nature of the possession—whether it was that of an alleged owner or that of an alleged agent.

IV. The trial court permitted the testimony of witness Condon, which purported to be impeaching testimony, in that he testified to a certain conversation with McCarty. It is urged that this was erroneously received, particularly because there was nothing in the testimony of an impeaching nature. We think this point is well taken, and that the objection should have been sustained to the materiality of Condon's testimony. Such evidence, however, was so wholly immaterial and inconsequential that we cannot consider it as having carried any prejudice whatever.

4. APPEAL AND error: inconsequential testimony.

V. It is urged, also, that the plaintiffs were purchasers of the instrument sued on, in due course and without notice. The defense being based upon fraud in the original transaction, the burden was upon the plaintiffs to prove their foregoing allegation. The allegation seems to have been quite ignored in the testimony. It does not appear what the entity of the payee was,—whether a partnership or a corporation. The evidence does tend to show that Scovel was president and Danford manager, at one time; and thereafter, Danford was president, and perhaps Scovel was manager. It also appears that Scovel and Danford sold the company to one De Bolt, and that De Bolt sold back to them the present cause of action without recourse. This is a suffi-

5. BILLS AND NOTES: tainted note: burden of proof.

cient indication of the record to show the absence therefrom of any debatable question of innocent purchaser.

Other minor details are discussed in the argument, none of which appear to us to be well taken. The instructions of the trial court were very full and fair, and were in line with the main contentions of appellants' argument here. The plaintiffs had a full and fair trial; and we are inclined to agree with the jury as to the fair preponderance of the evidence upon the larger merits of the case. The judgment below is—*Affirmed.*

GAYNOR, C. J., LADD and SALINGER, JJ., concur.